IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2011

# DOLWIN D. CORMIA v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 277569    Barry A. Steelman, Judge**

**No. E2010-02290-CCA-R3-PC - Filed October 21, 2011**

The Petitioner, Dolwin D. Cormia, filed a petition for writ of error coram nobis alleging that newly discovered evidence—a Naval document diagnosing the Petitioner with "antisocial personality disorder"—mandated a new trial.  The Hamilton County Criminal Court summarily dismissed the petition concluding that the Petitioner did not state a cognizable claim for coram nobis relief.  For the first time on appeal, the Petitioner alleges that the coram nobis judge erred by not sua sponte recusing himself based upon the fact that the coram nobis judge "was possibly an Assistant District Attorney and/or the Executive District Attorney" at the time his case was being prosecuted.  Following a review of the record, we conclude that the Petitioner has failed to allege the existence of subsequently or newly discovered evidence that would warrant relief under a writ of error coram nobis.  We also find that the Petitioner has failed to support his claim of recusal with sufficient documentation to require reversal.  The order of summary dismissal is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Dolwin D. Cormia, Wartburg, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; William H. Cox, III, District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

In 1998, the Petitioner was convicted by a Hamilton County jury of first-degree murder and abuse of a corpse.  For these convictions, he received concurrent terms of life

without the possibility of parole and two years, respectively.

The facts upon which the Petitioner was convicted have previously been summarized by this court as follows:

> In the light most favorable to the [S]tate, the evidence at trial demonstrated that the [Petitioner], . . . an East Los Angeles native, came to Chattanooga in the Spring of 1996 with Chris "May-May" Cameron and Dereath "Malik" Polydore. Cameron was in the marijuana trade, and upon learning from the [Petitioner] that marijuana could be sold much more profitably in Chattanooga than in Los Angeles, he agreed to pay the [Petitioner] to accompany him to Chattanooga and to introduce him around town. The three arrived on a Greyhound bus in April 1996. Apparently, the business developed suitably, and the three stayed in Chattanooga for at least three weeks. During this time, the three lived in the apartment home of Jamie Sammons, the [Petitioner's] girlfriend. Cameron and the [Petitioner] sold marijuana during this time, and the proceeds were split equally among these two men and Polydore.

> Meanwhile, on Saturday, April 27, 1996, the victim, Welton Green, Jr., called on his friend Kirby Marshall at the Lady Luck Beauty Salon, which was owned by Marshall and his wife. The victim, who was from California, was driving a large, late model, rented Mercury with California license plates. Marshall and the victim spent time driving around town that afternoon and made plans to go out later that evening.

> Later, Marshall and the victim went to a nightclub, The Whole Note, but they were denied admission because of their attire. They purchased alcohol and sat outside in the parking lot consuming it until after the club closed. That same evening, the [Petitioner], Polydore and Cameron were inside The Whole Note with Sammons and other female companions. The [Petitioner] and Sammons got into an argument at the club, and Sammons went home. After the club closed, the [Petitioner] and Cameron went to a Waffle House.

> When they arrived at the Waffle House, they encountered the victim and Marshall. The victim and the [Petitioner] hugged each other, although the [Petitioner] told the victim he did not know whether he should hug him or kill him. Cameron had heard the [Petitioner] speak of the victim stealing money from him, so he was surprised to see the two hugging. Cameron's pager went

-2-

off, and the victim offered to let Cameron use a cellular telephone in his car. While the victim was retrieving the telephone, Marshall told the [Petitioner] that the victim had a half kilo of cocaine and some money with him in Chattanooga. Marshall also revealed the location of the victim's hotel room.

A group of young women approached, and a plan was soon devised for the victim, the [Petitioner], and two of the women to go to the victim's hotel room for the remainder of the night. Cameron, who had by now returned the call to his pager, decided to return to Sammons' apartment.

The next morning, the [Petitioner] arrived at Sammons' apartment and made some telephone calls. Cameron was still in bed, but he overheard the [Petitioner] saying, "The guy is out here," or "The guy is here." After Cameron arose, the [Petitioner] inquired whether he would like "to go on a lick." In other words, the [Petitioner] was inviting Cameron to participate in a robbery. Because he was tired and had a hangover, Cameron declined. However, Varian LaShon "Skinny" Ford arrived to pick up the [Petitioner].

According to Ford, however, he met the [Petitioner] at the Big Orange Car Wash. The [Petitioner] made a telephone call, which Ford understood was to the victim. Thereafter, the victim showed up in his rented Mercury, and Ford and the [Petitioner] got into the car with him. Because Ford was familiar with Chattanooga, he drove. The victim was in the front passenger seat and the [Petitioner] was in the back seat. The three were cruising and headed in the direction of Hamilton Place Mall.

Cameron testified that the pretext which was used to get the victim to go on this car ride was that Ford, the [Petitioner] and another person were going to purchase some cocaine from the victim. In actuality, the [Petitioner's] plan was to rob the victim.

While Ford, the [Petitioner] and the victim were stopped at a traffic signal at the intersection of Lee Highway and Shallowford Road, a woman in a car behind the Mercury observed the driver (Ford) and the back-seat passenger (the [Petitioner]) jump on the person seated in the front passenger seat (the victim). At first, she thought they were horsing around, but then she saw that two or possibly all three of the men had drawn firearms. The eyewitness saw the man in the back seat "kind of angling the gun down over the fellow in the passenger seat." She saw the rear-seat passenger's hand jerk back, and she presumed the gun fired. Then, she saw a gun fly out the

window. The back-seat passenger casually got out of the car, retrieved the gun, and returned to the car. The car quickly left the scene. The driver and the back-seat passenger pushed the front-seat passenger down onto the floorboard. The eyewitness testified that in her opinion, the back-seat passenger was not acting in self-defense when he shot the victim; rather, he and the driver were attacking the victim.

There was evidence that when the [Petitioner] first attempted to fire his weapon, it did not discharge, so he attempted to fire it a second time, which caused the victim's fatal injury. Ford, the driver of the car, testified that after the [Petitioner] shot the victim, the [Petitioner] asked the victim why he made him do that. The [Petitioner] also told the victim that he owed him money and should have honored the debt. The [Petitioner] and Ford returned to the Big Orange Car Wash, where they parted company.

Ford purchased marijuana and then went to his girlfriend's apartment in the Mansion Hills complex. Later that evening he met the [Petitioner] at Sammons' apartment. The [Petitioner] was driving the victim's rental car. The victim's body was not in the vehicle. Ford saw a floor mat on the front passenger seat covering the victim's blood. Ford wiped his fingerprints from the car. The [Petitioner] wanted to go to the victim's motel room, so Ford, Cameron and the [Petitioner] left in Ford's car.

The [Petitioner] had a key which allowed the three access to the victim's motel room. Inside, they searched for money but were unable to locate any. They took two or three pieces of luggage from the room and returned to Mansion Hills. That evening, the [Petitioner] told Cameron in Ford's presence where he had disposed of the victim's body.

The next day, Marshall visited the [Petitioner] at Sammons' apartment. Marshall saw the victim's luggage in a bedroom.

Sometime in late April, the victim's rental car was discovered abandoned. A Chattanooga police officer had it towed to a private storage lot, where blood was discovered on the front passenger seat.

The [Petitioner] left Chattanooga and was for a time in Memphis. Eventually, he returned to California.

For months, investigation progressed, but the police department was

unable to locate the victim's body. In January 1997, the police received information from Ford which led them to discover the victim's skeletonized remains in a wooded area. They also received information from Ford and the [Petitioner's] other associates which led to the charges against the [Petitioner].

The [Petitioner] did not present evidence at trial; however, through cross-examination of witnesses he presented his theory that he shot the victim in self-defense because the victim pulled a gun on him while they were tussling. The jury rejected this theory and convicted the [Petitioner] of first degree murder and abuse of a corpse.

State v. Dolwin Deon Cormia, No. E1999-01504-CCA-R2-CD, 2000 WL 343793, at *1-3 (Tenn. Crim. App. Apr. 4, 2000), perm. appeal denied, (Tenn. Nov. 6, 2000).

In his direct appeal to this court, the Petitioner challenged the sufficiency of the evidence, the admissibility of opinion testimony from an eyewitness to the shooting, the admissibility of evidence of his involvement in the drug trade, and the jury instruction on first-degree murder. Id. at *1. This court found no error of law requiring reversal of the Petitioner's convictions and affirmed. Id. at *1, 10.

Thereafter, the Petitioner filed a petition for post-conviction relief alleging that he was denied effective assistance of counsel and that the assistant district attorney general committed prosecutorial misconduct. After an evidentiary hearing was conducted, the post-conviction court dismissed his petition. See Dolwin Deon Cormia v. State, No. E2003-00653-CCA-R3-PC, 2005 WL 3190313, at *3 (Tenn. Crim. App. Nov. 28, 2005), perm. appeal denied, (Tenn. Mar. 20, 2006). On appeal to this court, the Petitioner presented four issues for our review:

(1) that the post-conviction court erred by finding that the Petitioner was not denied effective assistance of counsel;
(2) that the post-conviction court erred by admitting Counsel's file of the Petitioner into evidence as a business record;
(3) that the post-conviction court erred by admitting hearsay testimony of Counsel into evidence; and
(4) that the post-conviction court erred by not granting post-conviction relief based upon the fact that the assistant district attorney general quoted from the bible in his closing argument at the Petitioner's trial.

Id. at *9. After reviewing the record and the applicable authorities, the panel concluded that the Petitioner's allegations did not merit relief and affirmed the judgment of the post-

conviction court. Id. at *1, 12.

On August 17, 2010, the Petitioner filed a petition for writ of error coram nobis. He based his claim for relief on alleged newly discovered evidence, specifically a consultation report from the United States Navy diagnosing him with "antisocial personality disorder" and difficulties with impulse control. The Petitioner provided the following rationale as to why the admissibility of the report would have resulted in a different verdict if the evidence had been admitted at his trial: "This new evidence coincides with [S]tate[']s witness Varion Ford, who testified that the [P]etitioner DID NOT intend to kill Welton Green, but reacted on impulse and in self-defense when the victim reached for and pulled his gun on the [P]etitioner." He contended that his mental disorder established his innocence, thereby preventing him from forming the requisite mental state for first-degree premeditated murder. The Petitioner acknowledged that the statute of limitations for filing a writ of error coram nobis was one year from the date of the final judgment in the case; however, he contended that he exercised due diligence in locating the report and that the petition should not be considered as time-barred because he filed the petition within one year from the date of discovery of the report. The Petitioner further elaborated that due process precluded application of the statute of limitations to bar consideration of his petition because his interest in obtaining a hearing to present newly discovered evidence, which might establish actual innocence, far outweighed any governmental interest in preventing the litigation of stale claims.

In its September 21, 2010 order summarily dismissing the petition, the coram nobis court framed the Petitioner's allegations as follows:

> (1) that there are newly discovered records from the United States [N]avy of his anti-social personality disorder and difficulties with impulse control;
> (2) that the newly discovered evidence corroborates the testimony of a prosecution witness that he did not intend to kill the victim but was reacting on impulse and in self-defense to the victim;
> (3) that due process precludes strict application of the statute of limitations; and
> (4) that he is indigent.

The coram nobis court then noted the one-year statute of limitations for filing a petition for the writ, but also remarked that the statute of limitations was an affirmative defense. The court went on to evaluate the merits of the petition, characterizing the substance of the Petitioner's argument as follows: "that the evidence in issue negates the mens rea element of the offense of first-degree murder." The court then determined that the Petitioner did not state a cognizable claim for relief:

It is true that the theory of the defense was self-defense. Even if the records in issue are newly acquired by the [P]etitioner, however, their contents are not newly discovered. One of the [P]etitioner's post-conviction claims, which, with others, he did not pursue on appeal, was that counsel did not investigate his competence to stand trial, even though he had told counsel that he was discharged from the military for a mental, physical, or personality disorder.

On October 4, 2010, the Petitioner filed a motion to alter or amend judgment pursuant to Tennessee Rule of Civil Procedure 59.04. He submitted that, while it was true that he raised the issue of his competency or mental status in his original pro se petition for post-conviction relief, the issue was not adopted by counsel in the amended petition and was not presented at the post-conviction hearing. The Petitioner alleged that he was not provided with the consultation report until February 22, 2010, when he requested his discharge records in an effort to join the "G.B.V.A. Veterans Club at Morgan County Correctional Complex[,]" and that it was only then that he received his "full medical record and consultation sheet[.]" He prayed for the court to alter or amend its judgment based upon this information.

The coram nobis court issued a thorough and extensive order denying the Petitioner's motion to alter or amend on October 17, 2010. The coram nobis court first observed that Rule 59 was inapplicable to a coram nobis proceeding and that such a motion was not authorized by statute. The court, treating the Petitioner's pleading as "a simple motion to reconsider[,]" then determined, "There is, however, no reason to reconsider." After restating its findings of facts and conclusions of law in its original order of summary dismissal, the coram nobis court found that the record in the Petitioner's post-conviction case supported its previous ruling, thereafter, citing to the post-conviction court's order denying post-conviction relief.

The post-conviction order provides as follows:

In his testimony, the [P]etitioner addressed issues that he did not raise in his amended petition, complaining that his trial counsel did not investigate his competency to stand trial . . . . The [S]tate did not object to this evidence, and the [c]ourt treats it as a de facto amendment to the petition.

. . . .

The Petitioner complains that counsel did not investigate his competency to stand trial, even though he told counsel that a mental, physical, or personality disorder was the basis for his discharge from the military. Considering the evidence indicating that he was competent to stand trial, *e.g.*,

his statement to counsel questioning, in view of Mr. Ford's evidence, the availability of a defense of identity in his case, and the absence of evidence, even now, indicating that he was incompetent to stand trial, the [c]ourt finds no deficiency or prejudice in counsel's performance in this respect.[1]

On appeal, this court concluded that the issue, among others, was waived because the Petitioner failed to include it in his appellate brief. Cormia, 2005 WL 3190313, at *10.

The coram nobis court, following its recount of the Petitioner's post-conviction case, concluded that, based on the Petitioner's testimony at the post-conviction hearing and the notation on his "Certificate of Release or Discharge from Active Duty" ("Narrative Reason for Separation: Other [illegible]/Mental Conditions-Personality Disorder"), the Petitioner was aware, prior to trial, that a personality disorder was the reason he was discharged from the Navy. The court elaborated that the evidence was not newly discovered because the consultation report was only "the more complete description of the diagnosis" and because the Petitioner's allegation that counsel did not investigate the issue "presupposes that this evidence was discoverable before trial." In addition, the court concluded that, even if the evidence was newly discovered, it was "not material." The court concluded that the evidence was "not material" (1) because a personality disorder was not a defense to prosecution nor did it strengthen the Petitioner's theory of self-defense and (2) because evidence of a personality disorder did not negate the proof of premeditation and aggression in the case.

The court instructed the Petitioner that he had 30 days from the entry of the September 21, 2010 order to timely file a notice of appeal document. His notice of appeal was "file-stamped" on October 27, 2010, by the trial court clerk. The certificate of service signed by the Petitioner reflects a date of October 22, 2010, for delivery of the document to be mailed to the attorney general's office. The case is now before us for our review.

## ANALYSIS

### I. *Notice of Appeal*

At the outset, we must address whether the Petitioner's notice of appeal document was timely filed. A notice of appeal must be filed within 30 days after the date of entry of the judgment from which a petitioner is appealing, unless said petitioner filed one of the motions listed in Tennessee Rule of Appellate Procedure 4(c). Tenn. R. App. P. 4(a), (c). The Petitioner's "motion to alter or amend" is not one of the motions listed in subsection (c) of Rule 4 and, therefore, does not toll the commencement of the 30-day period. Michael A. Sullivan v. Karen Watson, No. M2005-02061-CCA-R3-HC, 2006 WL 3831383, at *1-2

---

[1]This court may take judicial notice of its own records. See Tenn. R. App. P. 13(c).

-8-

(Tenn. Crim. App. Dec. 14, 2006) (citing State v. Bilbrey, 816 S.W.2d 71, 74 (Tenn. Crim. App. 1991) ("No other motion, including one for rehearing, is allowed to suspend the running of the appeal time from the entry of the judgment."); State v. Ryan, 756 S.W.2d 284, 285, n.2 (Tenn. Crim. App. 1988) ("[T]here is no provision in the Tennessee Rules of Criminal Procedure for a 'petition to reconsider' or a 'petition to rehear.'")); see also State ex rel. David W. Dunn v. Howard Carlton, Warden, No. E2009-01647-CCA-R3-HC, 2010 WL 2219623, at *3-4 (Tenn. Crim. App. June 3, 2010). Thus, the Petitioner had 30 days from the entry of the September 21, 2010 order to file a notice of appeal. Whether we use October 22, 2010 (the date the Petitioner signed the certificate of service), or October 27, 2010 (the date the document was actually filed with the trial court clerk), the document was not timely filed.

However, the filing of the notice of appeal document may be waived "in the interest of justice." Tenn. R. App. P. 4(a). In determining whether waiver is appropriate, the court shall consider the nature of the issues for review, the reasons for the delay in seeking relief, and other relevant factors presented in each case. Larry Coulter v. State, No. M2002-02688-CCA-R3-PC, 2003 WL 22398393, at *5 (Tenn. Crim. App. Oct. 21, 2003), perm. appeal denied, (Tenn. Mar. 8, 2004).

In his brief, the Petitioner has not addressed the issue of failing to timely file a notice of appeal, even though he was instructed on the issue by the coram nobis court. He has not filed a motion with this court seeking to be excused from the requirement of making a timely notice of appeal. We must proceed under the assumption that the Petitioner believed his filing of the motion to alter or amend tolled the 30-day filing requirement. We conclude that the time limit was not tolled and that the notice of appeal was not timely filed. However, we note that, due to the Petitioner's incarceration, it is likely that he did not receive the order denying his motion to alter or amend judgment precisely on October 17 and that his certificate of service is dated only five days later, October 22, which is just one day past the filing deadline. Additionally, the State has not sought dismissal of the appeal as untimely. In the interest of justice, we have determined to exercise our discretion and waive the timely filing of the notice of appeal in order to consider the petition on the merits.

## II. *Dismissal of the Petition*

A writ of error coram nobis is available to a defendant in a criminal prosecution. Tennessee Code Annotated section 40-26-105 provides, in pertinent part, as follows:

(b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a

showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

(c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c).

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 375.

To establish that he is entitled to a new trial, the Petitioner must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. Hart, 911 S.W.2d at 374-75.

The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003).

-10-

In <u>State v. Vasques</u>, our supreme court noted that "Tennessee courts have struggled with the proper standard to be applied in the determination of whether and when coram nobis relief is appropriate in a criminal case." 221 S.W.3d 514, 525 (Tenn. 2007). The court further explained that some courts had looked at whether new evidence "would have" resulted in a different judgment and some courts had used a "may have" standard. <u>Id.</u> Our high court reasoned that "the 'may have' standard, if interpreted literally, is too lenient in the common law context of writ of error coram nobis." <u>Id.</u> at 527. Thus, in <u>Vasques</u>, the Tennessee Supreme Court clarified the standard that should be used, explaining as follows:

> [W]e hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense. In our view, this interpretation upholds the traditional, discretionary authority of our trial judges to consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome.

<u>Id.</u> at 527-28.

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. Tenn. Code Ann. §§ 27-7-103, 40-26-105; <u>Mixon</u>, 983 S.W.2d at 671. The one-year statute of limitations may be tolled only when necessary so as not to offend due process requirements. <u>Workman v. State</u>, 41 S.W.3d 100, 103 (Tenn. 2001). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. <u>Harris</u>, 102 S.W.3d at 593 (citing <u>Sands v. State</u>, 903 S.W.2d 297, 299 (Tenn. 1995)).

Based on the record, it is clear that the petition was filed many years after the statute of limitations had expired. However, the record contains no pleading filed by the State in

response to the petition,[2] and "the statute of limitations [applicable to writs of error coram nobis] is an affirmative defense which must be specifically plead or is deemed waived." Newsome v. State, 995 S.W.2d 129, 133 n.5 (Tenn. Crim. App. 1998). While the coram nobis court in this case noted the applicable one-year statute of limitations period, the court did not summarily dismiss the coram nobis petition as time-barred—likely because the affirmative defense of the statute of limitations had not been properly raised at that time[3]—but summarily dismissed the petition on its merits finding that the Petitioner failed to state a cognizable claim for relief. Because the statute of limitations was not raised as an affirmative defense below, we will proceed to examine the Petitioner's claims.[4]

The Petitioner raises numerous challenges to the findings of the coram nobis court on appeal: (1) the coram nobis court erred "by making the assumption that the newly discovered/available evidence was available to [the] Petitioner and post-conviction counsel based upon [the] issue of [the] Petitioner[']s competency to stand trial having been raised in [the] post-conviction proceeding"; (2) the coram nobis court "abused its discretion in preliminary dismissing the petition . . . simply relying upon quotations from prior decision of this court, on [the Petitioner's] direct appeal as relating to sufficiency of the evidence"; (3) the coram nobis court "used the wrong standard and[/]or failed to fully follow the appropriate standard in denying the petition"; (4) the consultation report "requires this court to grant [his] petition"; and (5) the coram nobis erred by "finding that the newly discovered/available evidence was not material." After reviewing the record, we conclude that the error coram nobis court did not abuse its discretion when it dismissed the petition for writ of error coram nobis without appointing counsel or conducting a hearing.

We agree with the rationale provided by the coram nobis court in its extensive and thorough order denying the Petitioner's motion to alter or amend judgment. While it may be true that the Petitioner only recently received the consultation report, the Petitioner was aware that a personality disorder was the reason for his January 1991 discharge from the Navy. His "Certificate of Release or Discharge from Active Duty" form, which was given to him at the time of his discharge, notes the following: "Narrative Reason for Separation:

---

[2]We note that the coram nobis court sua sponte summarily dismissed the petition prior to the filing of a responsive pleading.

[3]See Reginol L. Waters v. State, No. M2006-01687-CCA-R3-CD, 2008 WL 366148, at *4-5 (Tenn. Crim. App. Jan. 16, 2008), perm. appeal denied, (Tenn. Sept. 15, 2008); Bruce Alan Littleton v. State, No. M2006-01675-CCA-R3-CD, 2007 WL 845900, at *2-3 (Tenn. Crim. App. Mar. 14, 2007), perm. appeal denied, (Tenn. Aug. 13, 2007).

[4]Because the statute of limitations was not raised an affirmative defense, we do not have to address whether due process requires the limitations period to be tolled pursuant to the analysis in Workman, 41S.W.3d 100.

Other [illegible]/Mental Conditions-Personality Disorder." The consultation report only provides a more complete description of his diagnosis.

Moreover, as noted by the coram nobis court, the post-conviction court considered the issue of trial counsel's failure to investigate the Petitioner's competency even though it was not included in the amended petition. The post-conviction court made the following ruling in its order denying post-conviction relief:

The Petitioner complains that counsel did not investigate his competency to stand trial, even though he told counsel that a mental, physical, or personality disorder was the basis for his discharge from the military. Considering the evidence indicating that he was competent to stand trial, *e.g.*, his statement to counsel questioning, in view of Mr. Ford's evidence, the availability of a defense of identity in his case, and the absence of evidence, even now, indicating that he was incompetent to stand trial, the [c]ourt finds no deficiency or prejudice in counsel's performance in this respect.

The Petitioner then appealed to this court raising only one issue of ineffective assistance. Therefore, this court treated his allegation that trial counsel "failed to investigate the Petitioner's competence to stand trial" as waived. See Cormia, 2005 WL 3190313, at *10.

It is fundamental that "[t]he [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition." Kenneth C. Stomm v. State, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App. May 12, 1992); see also Tenn. Code Ann. § 40-26-105. The fact that the Petitioner may not have received the consultation report until February 2010 is inconsequential; the issue was addressed at the post-conviction level, and the report does little to enhance the Petitioner's argument. Here, it is clear that the Petitioner was not only aware of the reason underlying his discharge from the Navy prior to trial but, in fact, he later claimed that trial counsel was ineffective for not investigating the matter more thoroughly after being informed that a "mental, physical, or personality disorder" was the basis of his discharge. The Petitioner has failed to allege the existence of subsequently or newly discovered evidence that would warrant relief under a writ of error coram nobis.

The coram nobis court then assumed, for the sake of argument, that the evidence was "newly discovered" but found that, nonetheless, the evidence was "not material." The court concluded that "[a] personality disorder is not a defense to prosecution[,]" citing to Tennessee Code Annotated section 39-11-501 (Insanity), which provides, "It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting

-13-

the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts." See Tenn. Code. Ann. § 39-11-501(a). The coram nobis court also found that the evidence of a personality disorder would not have strengthened the Petitioner's theory of self-defense, citing to Tennessee Code Annotated section 39-11-611(Self-dense), which requires "a reasonable belief that there is an imminent danger of death or serious bodily injury" and that "[t]he belief of danger is founded upon reasonable grounds." See Tenn. Code. Ann. § 39-11-611(b)(2). Finally, citing to this court's summarization of the facts in the Petitioner's direct appeal opinion, the court determined that the evidence of a personality disorder did not negate the proof of premeditation and aggression. See Cormia, 2000 WL 343793, at *4-5.

Regarding the Petitioner's argument that the error coram nobis court "used the wrong standard" when denying his petition, we conclude that this issue has no merit. In Vasques, our supreme court instructed that the trial court should "determine whether the new evidence may have led to a different result." 221 S.W.3d at 527. Our highest court also stated that the trial judges should "consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome." Id. at 528. It appears that the Petitioner is arguing that, because the coram nobis court did not use the precise words "may have led to a different result" in its findings, it used the wrong standard. After reviewing the "newly discovered evidence," the coram nobis court concluded, just as this court does, that the "newly discovered evidence" does not have "any judgment-affecting potential." See Alonzo Felix Andres Juan v. State, No. E2010-02147-CCA-R3-CD, 2011 WL 2693535, at *7 (Tenn. Crim. App. July 12, 2011).

We feel constrained to convey that our supreme court has distinguished "mental disease or defect" from emotional state or mental condition:

[W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997); see also State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005). The consultation report provided by the Petitioner does not support his argument that his "antisocial personality disorder" proves his innocence by negating the mens rea for murder. To the contrary, the treating psychologist stated in the report that the Petitioner was "not considered mentally ill" and that he did not require and would not have

-14-

"benefit[ted] from hospitalization or psychiatric treatment." The psychologist further provided, "There was no evidence of cognitive impairment. Normal psycho motor activity was evident. There was no evidence of psychosis, organicity, affective disorder, suicidality nor homicidality—suicidal/homicidal ideation or intent was denied." The report reflects that the evaluation was requested because the Petitioner had a "[history] of gang-related activity [and] violence," that he was "having difficulties at work," and that he feared "he may react violently." It was also noted that the Petitioner did not desire to remain in the Navy. To any extent that the Petitioner raises a cognizable claim under the error coram nobis statute, we agree with the rationale provided by the coram nobis court that the Petitioner has failed to establish that the subsequently or newly discovered evidence might have resulted in a different judgment had it been presented at the trial.

### III. *Recusal*

Finally, the Petitioner argues that the coram nobis judge should have recused himself or "conducted a hearing in relation to whether [he] was possibly an Assistant District Attorney and/or the Executive District Attorney while the case of the Petitioner was being handled by the Hamilton County District Attorney[']s Office." The State argues that the Petitioner cannot raise the issue for the first time appeal.[5] The Petitioner asserts that, because the coram nobis court summarily dismissed the petition, he was not provided with an opportunity to previously raise the issue.

A trial judge should recuse himself or herself whenever the judge "has any doubt as to his [or her] ability to preside impartially in a criminal case or *whenever his [or her] impartiality can reasonably be questioned*." Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (emphasis added). Although the first proviso is a subjective test, the latter emphasized proviso requires an objective standard. Alley v. State, 882 S.W.2d 810, 820-21 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Id. at 820. The standard of review on appeal is whether the trial court abused its discretion by denying the motion. Bd. of Prof'l Responsibility v. Slavin, 145 S.W.3d 538, 546 (Tenn. 2004); State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993).

The Code of Judicial Conduct states, in pertinent part, as follows:

> (1) A judge shall disqualify himself or herself in a proceeding in which

---

[5]The State says in its appellate brief that Judge Steelman presided over the Petitioner's trial; however, the record shows that Judge Douglas A. Meyer presided. See Cormia, 2000 WL 343793.

the judge's impartiality might reasonably be questioned, including but not limited to instances where:

       (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

       (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it . . . .

Tenn. Sup. Ct. R. 10, Canon 3.E.(1)(a)-(b). The commentary following subsection (a) and (b) provides,

       A lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of Section 3E(1)(b); a judge formerly employed by a government agency, however, should disqualify himself . . . in a proceeding if the judge's impartiality might reasonably be questioned because of such association.

At this juncture, we feel a brief overview of the relevant jurisprudence necessary. Our supreme court, in State v. Warner, held that the Tennessee Constitution did not require recusal where the judge was the District Attorney who prosecuted the defendant on two of the underlying offenses charged in the habitual criminal indictment. 649 S.W.2d 580, 581-82 (Tenn. 1983); see State v. Terry Byington, No. E2008-01762-CCA-R3-CD, 2009 WL 5173773, at *3 (Tenn. Crim. App. Dec. 30, 2009); State v. Conway, 77 S.W.3d 213, Tenn. Crim. App. 2001). Additionally, the supreme court in Warner limited the scope of Canon 3(E)(1)(b) to "the cause on trial . . . and not . . . prior concluded trials . . . ." 649 S.W.2d at 581; see also State v. Smith, 906 S.W.2d 6, 12 (Tenn. Crim. App. 1995).

In Owens v. State, a panel of this court determined that disqualification was not required where the post-conviction judge was "one of nearly seventy attorneys" employed by the District Attorney General's office during the prosecution of the petitioner, he never assisted in the prosecution of the case, and he knew nothing about the facts. 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999). Similarly, this court held a judge was not disqualified from hearing a post-conviction relief petition when the judge "had no involvement, whether investigatory or supervisory, with the petitioner's criminal case while she was in the district attorney's office," and the judge "had departed from the district attorney's office over one year prior to the indictment's return." Jesse C. Minor ex rel. Hal Hardin v. State, No.

M2001-00545-CCA-R10-PC, 2001 WL 1545498, at *9-10 (Tenn. Crim. App. Dec. 5, 2001). This court also held that "a judge need not disqualify himself or herself from hearing a criminal matter which was pending at the time when he or she served as an Assistant District Attorney in the same judicial district, if the judge neither reviewed, personally prosecuted, nor had any direct involvement in the case." State v. Margo Ellis, No. W2000-02242-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 579, at *6 (Tenn. Crim. App. July 19, 2001).[6] In addition, this court held a judge was not disqualified from hearing a post-conviction relief petition where, as an Assistant District Attorney General, he was merely present in the courtroom during one pre-trial hearing due to the absence of the assigned prosecutor and knew nothing about the petitioner's cases. Victor James Cazes v. State, No. W1998-00386-CCA-R3-PC, 1999 Tenn. Crim. App. LEXIS 1194, at *52-53 (Tenn. Crim. App. Dec. 9, 1999).[7] Finally, this court in John C. Welles, III, v. State, a case involving nine counts of aggravated sexual battery of a minor, concluded that, where the judge-then-prosecutor had general supervisory responsibilities in an "office having over forty attorneys[,]" recusal was not required. In that case, the panel reasoned that the judge was not disqualified because her responsibilities as a supervising prosecutor did not include oversight of child sexual abuse cases, she did not supervise the petitioner's case or the Assistant District Attorney General who prosecuted the petitioner's case, and she had no contact with the petitioner's case "either directly or indirectly[.]" No. M2002-01303-CCA-R3-PC, 2003 WL 21713423, at *5 (Tenn. Crim. App. July 23, 2003), perm. appeal denied, (Tenn. Nov. 24, 2003).

While the failure to seek recusal in a timely manner may result in waiver of a party's right to question a judge's impartiality, a reviewing court may nonetheless address the merits of a recusal issue because of the fundamental right of a criminal defendant to a fair trial. Byington, 2009 WL 5173773, at *3 (citing Slavin, 145 S.W.3d at 548) (other citations omitted). Moreover, we recognize that the Petitioner entered no personal appearance in court and was provided no opportunity to object as the coram nobis court's action was summary nature and, are mindful that, under certain facts, it would be prudent for this court to remand such an issue for further proceedings. See, e.g., Ashad R.A. Muhammad Ali v. State, No. M2002-02936-CCA-R3-PC, 2004 WL 193057, at *2-3 (Tenn. Crim. App. Jan. 28, 2004). However, under the circumstances of this case, we do not feel this is such a case.

Recently, in Juan, the petitioner presented this precise issue:

The Petitioner argues that "[t]he error coram nobis court should have

---

[6]Only the LEXIS citation is currently available.

[7]Again, only the LEXIS citation is currently available.

recused itself and/or conducted a hearing in relation to whether Judge Barry Steelman was possibly an Assistant District Attorney and/or the Executive District Attorney while the cases of either the Petitioner and/or that of the co-defendant were being handled by the Hamilton County [District Attorney's] Office." The Petitioner asserts that, because his petition was summarily dismissed, he had no opportunity to find out which judge was assigned his case and, therefore, had no opportunity to previously raise this issue.

2011 WL 2693535, at *7. The panel concluded that the Petitioner was not entitled to relief based upon the following rationale:

> In his brief, the Petitioner states that the error coram nobis judge "was possibly" an Assistant District Attorney at the time his, or his co-defendant's, case was being prosecuted. However, the Petitioner made no effort to submit documentary evidence to factually support his claim of a "possible" conflict of interest. He has not asked to supplement the appellate record with any kind of documentation supporting his broad allegations.

Id. at *8. We find the same rationale to be applicable here.

The record of the Petitioner's direct appeal reflects that David Denny and Dean Ferraro were the Assistant District Attorneys prosecuting the Petitioner at trial and that William H. Cox, III, was the District Attorney General at that time. See Cormia, 2000 WL 343793. In his post-conviction proceedings, the record reflects that Rodney C. Strong was the Assistant District Attorney on the matter and that William H. Cox, III, was still the District Attorney General at that time. See Cormia, 2005 WL 3190313.

As we noted from our discussion of the relevant caselaw, just because the judge was employed as an Assistant District Attorney in the Hamilton County District Attorney's Office at the time of the Petitioner's prosecution is not enough, by itself, to require recusal. Moreover, supervisory authority, without more, is not enough to disqualify a judge. The Petitioner's broad allegation of a "possible" conflict of interest is not supported by any documentary evidence from trial counsel or any other source and, therefore, a remand is not required on the record before us. He is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the summary dismissal of the petition for writ of error coram nobis.

_____
D. KELLY THOMAS, JR., JUDGE